IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

JEFFREY HALL                                                                        PLAINTIFF

v.                      NO. 4:17-cv-00449 PSH

NANCY A. BERRYHILL, Acting Commissioner             DEFENDANT
of the Social Security Administration

## MEMORANDUM OPINION AND ORDER

Plaintiff Jeffrey Hall ("Hall") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, he challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

Hall maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers two reasons why.[1] Hall first maintains that his depression and obesity are severe impairments, and the ALJ erred when he failed to so find. Second, Hall maintains that his residual functional capacity was erroneously assessed for the following reasons: there is no opinion from a treating physician addressing Hall's residual functional capacity, inadequate consideration was given to a prior disability rating, and inadequate consideration was given to Hall's work history.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

The record reflects that Hall was born on May 13, 1966, and was forty-three years old on August 19, 2009, i.e., the day he allegedly became disabled. He last met the insured status requirements of the Social Security Act on December 31, 2013. Thus, the relevant period in this case is from August 19, 2009, to December 31, 2013. He alleged in his application for disability insurance benefits that he became disabled and unable to work because of impairments that included degenerative disc disease, sleep apnea, carpal tunnel syndrome, and depression.

Hall has ably summarized the evidence in the record, and the Commissioner has not challenged the summary. It will not be reproduced, except to note several matters germane to the issues raised in the parties' briefs.

Hall served in the United States Navy from September of 1984 until September of 2004 and has been treated for his impairments exclusively at medical facilities operated by the Department of Veterans Affairs ("VA"). On November 14, 2008, he presented to a VA facility for complaints that included intermittent back pain, sleep apnea, and carpal tunnel syndrome. See Transcript at 586-590. Dr. Steven Strode, M.D., ("Strode") ordered testing of Hall's back, and the results revealed mild loss of space height at L5-S1. See Transcript at 626-627. Strode prescribed cyclobenzaprine and Etodolac for Hall's back pain. With regard to Hall's sleep apnea, Strode noted that Hall was using a CPAP machine. The mask did not fit well, though, and Hall had difficulty sleeping. Strode ordered a consultation with a VA sleep section. With regard to Hall's carpal tunnel syndrome, Hall reported that it affected both his hands and caused intermittent numbness in several of his fingers. The pain was worse in his right hand. Strobe prescribed bilateral wrist splints to be worn during sleep.

Hall was seen at VA facilities for his continued complaints of back pain on several occasions between November 14, 2008, and March 25, 2011. See Transcript at 573-576 (03/26/2009); 479-483, 621 (06/10/2010); 475-478 (07/07/210); 406-409 (09/12/2010); 401-406 (09/27/2010); 391-395 (10/12/2010); 314-315 (10/29/2010); 373-376 (12/14/2010); 366-372 (01/07/2011).[2] Testing was performed on June 10, 2010, and the results revealed the following:

> Very mild spurring is seen along the lower thoracic and lumbar vertebrae. Slight posterior disc space narrowing at L5/S1 is seen. The visualized pedicles and the sacroiliac joints are unremarkable. Findings appear relatively stable since the previous of 11/14/08. Arthritic changes are noted involving the right-sided facet joint at L5/S1 and left-sided facet joint at L4/5.

See Transcript at 621. Hall continued to experience back pain and sought emergency room care for his pain on September 12, 2010. Testing was performed, and the results revealed "[m]ild disc space narrowing at L5/S1" and "very small anterior osteophytes at a few levels" but no "acute compression deformities." See Transcript at 409. He was given an injection of Toradol and continued on prescription medication. An MRI of his lumbar spine was performed on October 29, 2010, and the attending physician interpreted the results as follows:

> 1. No evidence of spinal canal stenosis throughout the lumbar spine. 2. No evidence for neuroforaminal stenosis throughout the lumbar spine. However, the hypertrophied superior facets of S1 contact the existing L5 nerve roots bilaterally. 3. Degenerative disc disease from L3-L1 …

---

[2] Hall rarely sought medical attention for just one impairment during the typical examination; instead, he usually sought medical attention for several impairments during a single examination. There are other instances in which he sought medical attention for his complaints of back pain. The Court has identified the dates above because they appear to be when he primarily complained of back pain. The Court will do likewise with his other impairments, i.e., the Court will only note the dates when the impairment appeared to have been the primary complaint.

3

Hall was seen at VA facilities for his sleep apnea on a few occasions between November 14, 2008, and March 25, 2011. See Transcript at 582-585 (12/09/2008), 573-576 (03/26/2009), 511-515 (02/01/2010). When he was seen on December 9, 2008, he acknowledged that he had not been using his CPAP machine as recommended. He was counseled on the importance of using the machine. When he was seen again on March 26, 2009, he reported that he was doing "ok" with the machine. See Transcript at 575.

Hall was seen at VA facilities for his carpal tunnel syndrome on several occasions between November 14, 2008, and March 25, 2011. See Transcript at 573-576 (03/26/2009); 566-567, 624-625 (07/22/2009); 562-564 (08/20/2009); 533-534 (12/21/2009); 552-553 (12/28/2009); 527-528 (01/15/2010); 518-522 (01/21/2010); 516-517 (01/25/2010); 504-505 (03/11/2010); 495-496 (03/17/2010); 488-489 (03/29/2010); 391-395 (10/12/2010); 366, 379 (01/11/2011). He was initially treated conservatively for his pain, but he eventually underwent a left carpal tunnel release on January 15, 2010. The physician who performed the procedure prepared a letter in which he represented that Hall was entitled to a one hundred percent temporary disability rating but could resume normal activities of daily living after four weeks of recovery. Hall initially reported good results from the surgery but reported that pain and swelling eventually returned to his left hand. At the March 17, 2010, presentation, he was observed to have decreased grip and pinch strength in his left hand. He was given a TheraBall, a cock-up splint, a strip of silicone gel and dressing, and a mini-vibrator for the pain. On January 11, 2011, a nerve conduction study was performed. The results of the testing revealed normal conduction on his left but "slowing on the [right] wrist consistent with carpal tunnel [syndrome]." See Transcript at 379.

Hall also occasionally sought treatment for depression between November 14, 2008, and March 25, 2011. See Transcript at 511-515 (02/01/2010), 496-504 (03/17/2010), 484-487 (05/17/2010), 391-395 (10/12/2010), 387-391 (10/14/2010). His depression appeared to have been caused primarily by situational concerns. For instance, he expressed concerns about his inability to work and problems with his family and finances. He reported sleeping a great deal and being inactive. An adjustment disorder with mixed anxiety and depression related to a general medical condition were diagnosed, and he was prescribed medication.

During the period between November 14, 2008, and March 25, 2011, Hall also struggled with his weight. When he was seen on March 10, 2011, he had a Body Mass Index of 34.1. See Transcript at 351-355. He was encouraged to lose weight and was prescribed an exercise program.

On March 25, 2011, the VA granted Hall a "total service-connected evaluation for individual unemployability benefits … as a result of [his] service-connected disability," which was evaluated at "ninety percent disabling." See Transcript at 299. A twenty percent evaluation was assigned for "degenerative disc disease lumbosacral spine," a fifty percent evaluation was assigned for sleep apnea, a ten percent evaluation was assigned for "right knee patellofemoral syndrome," a ten percent evaluation was assigned for "left knee patellofemoral syndrome," a twenty percent evaluation was assigned for carpal tunnel syndrome in his left hand, and a thirty percent evaluation was assigned for an adjustment disorder with depressed mood. See Transcript at 299-300. His entitlement to benefits was granted effective September 2, 2009, and was considered to be permanent in nature.

Hall was seen for his complaints of back pain between March 25, 2011, and December 31, 2013. See Transcript at 343-347 (10/03/2011), 759-762 (07/06/2012), 731-735 (04/03/2013), 620-621 (09/11/2013). The progress notes reflect that he continued to be diagnosed with back pain and prescribed medication that included meloxicam and cyclobenzaprine. When he was seen on October 3, 2011, to re-establish care in Illinois after leaving Arkansas, he reported that his back pain was "mellow," but he had to be very careful about how he moved around. See Transcript at 343. He reported that he was not exercising but was nevertheless constantly on his feet. At a February 8, 2012, presentation primarily for wrist pain, he reported that his back pain had improved over the previous six months and only arose when he felt stressed. See Transcript at 333. He reported that cyclobenzaprine took care of any pain he might experience. On June 10, 2013, Hall was authorized to receive approximately five weeks of chiropractic care for the treatment of "chronic low back pain." See Transcript at 722. On September 11, 2013, testing of his back was performed, and the attending physician interpreted the results as follows:

> Cervical spine -- There is straightening of the cervical spinal lateral view. Disk spaces are mildly narrowed at C5-6, C6-7, and C7-T1. Anterior osteophytes are noted from C4 through C7. No compression deformity. No listhesis. No prevertebral soft tissue swelling.
>
> Thoracic spine -- Alignment of the thoracic spine is maintained only AP and lateral view. Minimal anterior osteophyte formation is noted at multiple levels within the thoracic spine without evidence of compression deformity or listhesis.
>
> Lumbar spine – Alignment of the lumbar spine is maintained on the AP and lateral view. Disk space narrowing at L5-S1. Mild anterior osteophyte formation is seen at L1-2, L3-4, and L5-S1. No compression deformity or listhesis.

See Transcript at 620. "Mild multilevel degenerative changes" were diagnosed. See Transcript at 620.

Hall appears to have reported few difficulties with sleep apnea between March 25, 2011, and December 31, 2013. The only progress note of any real significance is from November 6, 2012, when he was seen for a CPAP Titration Study. See Transcript at 744-746. The attending physician opined that Hall probably had adequate CAPA-titration. The physician's recommendations included use of a CPAP machine at the appropriate setting and "[g]radual weight control towards an ideal weight of 70 Kg [i.e., approximately 154 pounds] using appropriate diet and exercise that is within safe limits of [Hall's] current medical condition." See Transcript at 745.

Hall continued to be seen for his carpal tunnel syndrome between March 25, 2011, and December 31, 2013. See Transcript at 343-347 (10/03/2011), 337-340 (10/14/2011), 333-337 (02/08/2012). The progress notes reflect that he continued to complain of pain in his wrists and hands, and he continued to be prescribed medication. When he was seen on October 14, 2011, he reported that the left carpal tunnel release had relieved some of the numbness, but his pain had increased. He reported that his pain was "mainly at the base of the middle three fingers and affect[ed] the thumb as well at times." See Transcript at 337. He had wrist splints but admitted to spending a good deal of time on the computer. When Hall was seen on February 8, 2012, he again reported that his pain had increased since the surgery, but the pain was controlled with gabapentin. "He opted not to have his right [carpal tunnel] released and continued to have pain in the distribution of his median nerve." See Transcript at 333. He showed no weakness, though, and his grip strength was 5/5 throughout.

Hall continued to be seen for depression between March 25, 2011, and December 31, 2013. See Transcript at 745-751 (10/02/2012), 756 (10/23/2012), 737-740 (04/03/2013), 717-720 (06/20/2013), 426-430 (09/24/2013). He continued to be diagnosed with depression and/or an adjustment disorder and prescribed medication. On August 20, 2011, Dr. Kenneth Hobby, Ph.D., ("Hobby") performed a mental diagnostic evaluation of Hall. See Transcript at 302-313. Hall's complaints were noted to be as follows: "[Hall's] depression is because of the physical problems. He states that the symptoms that have had the most effect on [his] ability to work have been his back pain, carpal tunnel, and with the depression he can't remember things." See Transcript at 302. Hall was observed to be of a normal height but of slightly above normal weight. His mood was depressed but relaxed, his affect was situationally appropriate, and he had no problems with his speech, thought process, or thought content. Hobby diagnosed an adjustment disorder with depressed mood but made the following findings with respect to Hall's adaptive functioning:

> 1. How do mental impairments interfere with this person's day to day adaptive functioning? ...
>
> This individual reported being able to drive a car on familiar roads. He said he could drive on unfamiliar routes. He said he can drive alone for distances up to any number of miles from home. He reports the following problems with being able to shop adequately for groceries, clothing, and personal items: None. He reports the following problems with being able to use a checkbook to pay bills: None. He reports the following problems with being able to make change and purchase things at the store with cash: None. He reports that he participates in the following social groups: Immediate family. On a typical day, he gets up at 10 a.m. During the day he plays on a computer, talks with his wife, piddles in the yard every once in a while, and fixes something to eat. In regard to [his activities of daily living], his reported MENTAL impairment DOES NOT appear to significantly impact an independent level of feeding himself, bathing, self-care, personal hygiene, and dressing.

2. Capacity to communicate and interact in a socially adequate manner? …

This individual reports getting along well with his parents. He reports getting along well with his siblings. He reports getting along well with his neighbors. In school, good relationships were reported with his teachers and all but one here and there of his schoolmates. He reported good relationships with his childhood playmates.

No significant limitations were noted in his current capacity to communicate and interact in a socially adequate manner. There were no discrepancies between alleged inadequacies and the interpersonal skill level demonstrated during the interview.

3. Capacity to communicate in an intelligible and effective manner?

This person's grammar was adequate for communicating information on at least a basic work-like task. This individual did not seem to have any difficulty understanding instructions given by the examiner. There seems to be a level of understanding that would enable the person to respond to normal instructions.

4. Capacity to cope with typical mental/cognitive demands of basic work-like tasks?

This individual has the ability to understand, carry out, and remember basic work-like tasks. This individual would probably respond adequately to work pressure in a work-like setting if he could physically do the work.

5. Ability to attend and sustain concentration on basic tasks?

No limitations were observed in this individual's ability to attend and sustain concentration on basic work-like tasks.

6. Capacity to sustain persistence in completing tasks?

He was able to persist at the tasks during the interview. He should be able to mentally persist on appropriate skill level work-like tasks for an 8 hour day if he could physically do the work.

7. Capacity to complete work-like tasks within an acceptable time frame?

The pace at which this person worked was normal and steady and appropriate for completing work-like tasks.

See Transcript at 310-311. On June 11, 2012, Dr. Gary Ludwig, Ph.D., ("Ludwig") performed a mental status evaluation of Hall. See Transcript at 415-417. Hall's affect was flat, and his mood appeared depressed. Hall reported that he spent most of his days playing on the computer. He also reported remodeling his house but noted that he could only work for about twenty minutes at a time before he required rest. He reported taking citalopram for his depression. Ludwig diagnosed major depression.

During the period between March 25, 2011, and December 31, 2013, Hall continued to struggle with his weight. When he was seen on April 3, 2013, he had a BMI of 35.6. See Transcript at 733. Hall and the attending physician discussed "weight loss through increasing physical activity." See Transcript at 734.

Hall's medical records were reviewed by state agency medical professionals. See Transcript at 75-84, 86-96, 65-72. Their findings were inconsistent. It appears that two of the professionals opined that Hall was capable of performing medium work with a limitation for right hand fingering. Another professional opined, though, that Hall was limited to light work with postural but no manipulative limitations.

A series of documents were completed by Hall and others in connection with his application. See Transcript at 206-212, 218-223, 242-249, 250-260, 263-267, 268-273. In the documents, he represented that he is five feet, six inches tall and weighs approximately two hundred pounds. He has a hard time standing, shopping, or doing tasks around the house. He represented that he has difficulty walking and has to spend all of his time at home. He can cook and wash dishes but must sit in a chair to do so. He requires a CPAP machine to sleep at night. He continues to take prescription medication for pain and depression.

The record contains a summary of Hall's earnings. See Transcript at 169-170. The summary reflects that he had earnings for three of the four years between his discharge from the United States Navy and his alleged onset date.

Hall testified during the administrative hearing. See Transcript at 29-57. He was one month shy of his fiftieth birthday. His last job was doing janitorial work at Wal-Mart, but he stopped working because of problems caused by his back pain and carpal tunnel syndrome. During the relevant period, Hall occasionally hunted and fished but primarily devoted his time to playing computer games. He helped out around the house, doing various jobs in and around the house. He did not exercise. He estimated that he could stand in place for only about five minutes at one time and could not be on his feet for more than about one to two hours a day. He remained seated most of the day. Hall's depression caused him to "get agitated a little bit easier than most," see Transcript at 50, and affected his ability to concentrate. When asked to rank his impairments in terms of their impact on his ability to work, he listed his back, then the following: his hands, his knees, his depression, and his sleep apnea.

The ALJ found that Hall had severe impairments in the form of spine disorders and carpal tunnel syndrome during the relevant period. The ALJ considered Hall's sleep apnea, obesity, and depression but found that they were not severe impairments. The ALJ assessed Hall's residual functional capacity and found that he was capable of performing medium work but with the following additional limitations:

> … he was limited to lifting and carrying 50 pounds occasionally and 25 pounds frequently. He could sit for at least 6 hours in an 8-hour workday. He could stand and/or walk at least 6 hours in an 8-hour workday. He could push and pull the same amounts he could lift and carry. His fingering on the right side was limited to frequent.

See Transcript at 14. In so finding, the ALJ gave little weight to the VA disability rating because it was inconsistent with the record as a whole and was made on the basis of VA policies and definitions, not the policies and definitions applied by the Commissioner. The ALJ gave little weight to Hobby and Ludwig's evaluations of Hall's mental impairment because Hobby and Ludwig appeared to have based their diagnoses solely on Hall's self-reports. The ALJ also gave little weight to the opinion of the state agency medical professional who opined that Hall was limited to light work with postural but no manipulative limitations. The ALJ gave great weight, though, to the opinions of the state agency medical professionals who opined that Hall was capable of performing medium work with a limitation for right hand fingering. The ALJ found that Hall was capable of performing his past relevant work during the relevant period and therefore was not disabled for purposes of the Social Security Act. The ALJ alternatively found that if Hall could not perform his past relevant work, there was other work he could have performed during the relevant period.

Hall maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole. Hall first maintains his depression and obesity are severe impairments, and the ALJ erred at step two of the sequential evaluation process when he failed to so find. With respect to Hall's depression, Hall maintains that the ALJ gave inadequate reasons for discounting the diagnoses of four mental health professionals, all of whom diagnosed Hall with a mental impairment. With respect to Hall's obesity, Hall maintains that the reason the ALJ gave for discounting the obesity, i.e., Hall consistently denied shortness of breath upon exertion, is an inadequate basis for discounting the severity of his excess weight.

At step two, the ALJ is obligated to identify the claimant's impairments and determine if they are severe. An impairment is severe if it has "more than a minimal effect on the claimant's ability to work." See Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1992) [internal quotations omitted].

Substantial evidence on the record as a whole supports the ALJ's finding that Hall's depression and obesity were not severe impairments. The Court so finds for three reasons. First, the determination at step two is a medical determination, see Bowen v. Yuckert, 482 U.S. 137 (1987), and there is little medical evidence that Hall's depression and obesity had more than a minimal effect on his ability to work. Although he was diagnosed with depression and/or an adjustment disorder with depressed mood, the evidence underlying the diagnoses consists primarily of his self-reports. It is true that he struggled with his weight, but there is little evidence that his excessive weight impacted his other impairments in any significant way.

Second, to the extent there is medical evidence relevant to the severity of Hall's depression and obesity, it is unremarkable. His depression appeared to have been caused by situational concerns, i.e., it was brought about by an inability to work and problems arising from his family and finances. Moreover, the impairment did not give rise to any functional limitations as Hobby and Ludwig identified few, if any, restrictions in Hall's adaptive functioning. Moreover, Hall was asked to rank his impairments in terms of their impact on his ability to work, he listed his back, hands, and knees before making any mention of his depression. With respect to Hall's obesity, the record reflects that his BMI was well above thirty on a number of occasions, but he was repeatedly encouraged to lose weight by increasing his physical activity and exercising.

Third, the ALJ's failure to identify Hall's depression and/or obesity as severe impairments at step two is ultimately of little legal significance. Once the ALJ proceeds past step two, as he did here, the labeling of an impairment as "severe" or "non-severe" has little legal significance because the ALJ must consider all of the claimant's impairments in crafting the residual functional capacity. See 20 C.F.R. 416.945(e).

Hall offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. It is Hall's contention that his residual functional capacity was erroneously assessed, and he offers three reasons why.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most a person can do despite his limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of making the assessment, the ALJ is required to evaluate the claimant's subjective complaints and do so in accordance with the factors identified in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).

Hall first maintains that the record was not adequately developed because there is no opinion from a treating physician. It is Hall's contention that the ALJ should have obtained an opinion from a treating physician, or ordered a consultative examination, rather than rely solely upon the opinions of non-examining physicians and the ALJ's own inferences. Alternatively, Hall maintains that "the ALJ's residual [functional] capacity finding is not supported by what evidence there is in the record." See Docket Entry 8 at CM/ECF 34.

The Court is satisfied that the ALJ adequately developed the record, and there is sufficient information for her to have made an informed decision.[3] It is true that there is no opinion from a treating physician addressing Hall's ability to perform work-related activities. Although such an opinion would have been helpful, one was not required.[4] The ALJ could and did rely upon the medical records prepared by Hall's treating physicians. Their records reflect that although Hall suffered from degenerative disc disease, it was characterized as mild. His back pain responded favorably to medication, and he was encouraged to lose weight by, inter alia, exercising consistent with his abilities. When he did receive other treatment for his back pain, the treatment was conservative. For instance, in June of 2013, he was authorized to receive approximately five weeks of chiropractic care for his "chronic low back pain."

Hall reported difficulties sleeping, but the medical records prepared by his treating physicians reflect that he had not been using his CPAP machine properly. After being counseled on the importance of using the machine properly, and undergoing a CPAP Titration Study, he made few complaints about difficulties sleeping.

---

[3] The ALJ has an obligation to fully develop the record. See Battles v. Shalala, 36 F.3d 43 (8th Cir. 1994). There is no bright line test for determining whether the ALJ fully developed the record; the determination is made on a case by case basis. See Id. It involves examining whether the record contains sufficient information for the ALJ to have made an informed decision. See Pratt v. Asture, 372 Fed.Appx. 681 (8th Cir. 2010).

[4] In Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016), the Court of Appeals observed the following:

... "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Cox, 495 F.3d at 619. However, there is no requirement that an [residual functional capacity] finding be supported by a specific medical opinion. See Myers, 721 F.3d at 526-27 (affirming RFC without medical opinion); Perks v. Astrue, 687 F.3d 1086, 1092-93 (8th Cir. 2012) (same).

... In the absence of medical opinion evidence, "medical records prepared by the most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings." Johnson v. Astrue, 628 F.3d 991, 995 (8th Cir. 2011). ...

Hall's carpal tunnel syndrome appeared to have been his primary impairment, particularly the carpal tunnel syndrome in his right hand. The medical records prepared by his treating physicians reflect that the impairment responded to medication. For instance, when he was seen on February 8, 2012, he reported that his pain was controlled with gabapentin. A left carpal tunnel release helped relieve some of the numbness in that hand, although the pain in the hand eventually returned. Despite the pain in his hands, he acknowledged spending a good deal of time on his computer. Moreover, his grip strength was observed to be 5/5 throughout. In any event, the ALJ accounted for Hall's carpal tunnel syndrome in assessing his residual functional capacity by limiting his ability to finger on the right side.

Hall experienced bouts of depression and sought medical attention for his condition on a number of occasions. The medical records prepared by his treating physicians reflect, though, that his depression sprang from situational concerns involving an inability to work, his finances, and his family. His depression was not chronic. There is no evidence the impairment gave rise to any meaningful restrictions in his adaptive functioning.

The record reflects that Hall was five feet, six inches tall and weighed, at times, as much as two hundred pounds. His BMI was consistently above thirty-five, which placed him in the obese range. Despite carrying excessive weight, there is no evidence that Hall's weight impacted his residual functional capacity. The medical records prepared by his treating physicians reflect that he was encouraged to lose weight by exercising consistent with his abilities, and he was capable of performing many routine activities of daily living.

The ALJ did not rely solely upon the medical records prepared by Hall's treating physicians, though. The ALJ also considered Hall's testimony, his representations as to his daily activities, and the opinions offered by the state agency medical professionals. For instance, the ALJ could and did find that Hall's daily activities included taking care of his mother's properties, playing computer games, watching television, camping, fishing, cooking, and caring for his children. Hall was also capable of sitting in an automobile while he drove long distances and was capable of walking long distances.

Hall faults the ALJ for relying too heavily upon the opinions of the state agency medical professionals. The Court cannot agree. The record reflects that their opinions were but one of the factors the ALJ relied upon in assessing Hall's residual functional capacity. Moreover, as the ALJ could properly find, their opinions were "consistent with the record as a whole ..." See Transcript at 16.

Hall next maintains that inadequate consideration was given to the VA disability rating. Although the VA assigned him a total and permanent disability rating, Hall maintains that "[t]he ALJ ... gave the VA's decision little weight on the ground that it was not based on the Social Security Administration's policy or definition of disability." See Docket Entry 8 at CM/ECF 35. Hall characterizes the reason as arbitrary.

"[A] disability determination by the VA is not binding on an ALJ considering a Social Security applicant's claim for disability benefits." See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1988). The rating is nevertheless entitled to some weight and must be considered in the ALJ's decision. See Id. If the ALJ does not give explicit attention to the rating, it is adequate if she addresses and discredits the medical records supporting the VA's determination. See Baker v. Colvin, 620 Fed.Appx. 550 (8th Cir. 2015).

Here, the ALJ gave adequate and explicit consideration to the VA disability rating. It is true that at one point in her opinion, she noted that the rating was given little weight because it was "not based on this Agency's policy or definitions of disability." See Transcript at 17. Had that reason been the only reason for discounting the rating, the Court would agree with Hall that the reason was arbitrary and therefore improper. That reason was not, though, the only reason provided by the ALJ. At another point in the opinion, she noted that the rating was discounted because it was inconsistent with the record as a whole. That reason is not arbitrary and not improper because it is supported by substantial evidence on the record as a whole.

Hall last maintains that adequate consideration was not given to his work history. He notes that he served for twenty years in the United States Navy, and his military service "greatly enhances his credibility." See Docket Entry 8 at CM/ECF 36.

Although the ALJ's opinion does not contain an extensive discussion of Hall's work history in general or his military service in particular, substantial evidence on the record as a whole supports the ALJ's limited consideration of Hall's work history. Hall testified about his military service and the work he performed while in the service. Specifically, he testified that he was trained as an automobile mechanic/heavy equipment mechanic. The ALJ represented that she considered Hall's work history at step four, see Transcript at 17, and the Court presumes that the ALJ did as she represented. In any event, a claimant's work history is but one factor the ALJ should consider in crafting a claimant's residual functional capacity. It is not clear how a more extensive analysis of Hall's work history would have led to a different assessment of his residual functional capacity.

The governing standard in this case, i.e., substantial evidence on the record as a whole, allows for the possibility of drawing two inconsistent conclusions. See Culbertson v. Shalala, 30 F.3d 934 (8th Cir. 1994). The ALJ crafted an assessment of Hall's residual functional capacity that limited him to medium work, and Hall has not shown why the ALJ erred in doing so. In short, the ALJ could find as she did.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Hall's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 28th day of February, 2018.

_____
UNITED STATES MAGISTRATE JUDGE